**TRANSAMERICA CASH RESERVE, INC., a Maryland corporation, and First National Bank of Boston, Plaintiffs and Appellees,**

v.

**DIXIE POWER AND WATER, INC., Darrell G. Hafen, Transworld Securities, S.A., a corporation, and Does 1 through 100 inclusive, Defendants and Appellants.**

Nos. 20450, 860508.

Supreme Court of Utah.

March 6, 1990.

Scott A. Gubler, St. George, for defendants and appellants.

John L. Miles, J. MacArthur Wright, St. George, for plaintiffs and appellees.

ZIMMERMAN, Justice:

Dixie Power & Water, Inc., appeals from a grant of summary judgment in favor of Transamerica Cash Reserve, Inc., and First National Bank of Boston (collectively referred to as "Transamerica") for monies owed Transamerica by Darrell G. Hafen and from the trial court's denial of its post-judgment objections to the findings of fact and conclusions of law. Dixie claims, inter alia, that the trial court erred in find-

ing as a matter of law that Dixie was the alter ego of co-defendant Darrell G. Hafen and in denying Dixie's counsel an attorney's lien against funds of Dixie that were claimed by Transamerica. We reverse the trial court's alter ego holding and the summary judgment based on that holding, affirm the denial of an attorney's lien, and find no reason to reach the other issues raised on appeal.

Transamerica Cash Reserve, Inc., a money market mutual fund, and First National Bank of Boston, the transfer agent for Transamerica, brought this action against Hafen, Transworld Securities, S.A., and Dixie Power & Water, Inc., to recover monies Hafen allegedly obtained from Transamerica via a series of fraudulent transactions. Testimony elicited at a hearing indicated that Hafen had made deposits purporting to total $1,465,000 to the Transamerica money market fund. On these deposits, Transamerica ultimately collected only $12,000. Before Transamerica was aware of the true nature of Hafen's deposits, he had withdrawn $406,380.75 from the account. The suit against Hafen and Dixie was part of the effort by Transamerica to recover its losses.

In addition to claiming directly against Hafen, Transamerica asserted that Dixie was the alter ego of Hafen. Transamerica moved for a prejudgment writ of attachment against any funds owned by the various defendants then on deposit at First Security Bank's office in St. George. Dixie had funds on deposit with First Security. The district court granted Transamerica's motion, finding as a matter of law that Dixie is Hafen's alter ego and that Dixie's assets are, in fact, Hafen's and are reachable by Hafen's creditors.

According to the record, Hafen's stock ownership gave him complete control of Dixie. However, Dixie was not involved in Hafen's scheme, and none of Dixie's assets, including the money on deposit with First Security, was obtained as a result of Hafen's fraudulent activities. In fact, Dixie's funds on deposit at First Security were the proceeds of a legitimate sale of water rights owned by Dixie. The court based its alter ego decision on a finding that no corporate formalities were observed by Hafen, his family, or the other shareholders of Dixie. Specifically, the evidence showed that there were no shareholders' meetings, no board of directors' meetings, and no tax returns filed for Dixie and that Dixie's secretary, Hafen's son, knew almost nothing of Dixie's business affairs.

Following the grant of the writ of attachment, Dixie's counsel, Scott A. Gubler, filed a notice of an attorney's lien, claiming a portion of the attached funds as due for fees. The court ruled that an attorney's lien should be impressed on the attached funds. Transamerica then moved to amend that ruling, arguing that the assets attached did not belong to Dixie but to Hafen and were therefore not properly subject to attachment. The court agreed and ordered the lien discharged.

Transamerica moved for summary judgment on its complaint, seeking payment of Hafen's debt from Dixie's assets based on the pleadings, evidence, and live testimony. The district court granted the motion on the premise that Dixie was the alter ego of Hafen.

On appeal, Dixie challenges several rulings of the district court. We need only consider two of those claims: first, the finding that Dixie was the alter ego of Hafen, thus permitting Transamerica to reach its assets, and second, the denial of the request for an attorney's lien on Dixie's funds.

█ We note the applicable standard of review. Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *E.g., Utah State Retirement Office v. Salt Lake County,* 780 P.2d 813, 814–15 (Utah 1989); *CECO v. Concrete Specialists, Inc.,* 772 P.2d 967, 969 (Utah 1989); Utah R.Civ.P. 56(c). Because summary judgment by definition does not resolve factual issues, a challenge to summary judgment presents for review only questions of law. We review those conclusions for correctness, according no particular deference to the trial court. *E.g., Mountain Fuel Supply Co. v.*

*Salt Lake City Corp.*, 752 P.2d 884, 887 (Utah 1988); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

We first address the trial court's determination that Dixie's assets should be treated as Hafen's. In the usual case, the corporation is viewed as a legal entity distinct from its shareholders. Under the equitable "alter ego" doctrine as it originally evolved, courts would, upon a proper showing, disregard the integrity of the corporation and view a controlling shareholder as indistinguishable from the corporation, thereby permitting creditors of the corporation to reach the assets of a controlling shareholder. *See Dockstader v. Walker*, 29 Utah 2d 370, 372–73, 510 P.2d 526, 528 (1973); *Geary v. Cain*, 79 Utah 268, 273, 9 P.2d 396, 398 (1932). This was done to prevent the legal separation between the corporation and the controlling shareholder or shareholders from being used to perpetuate an injustice on third parties. In some states, the doctrine evolved to permit creditors of an individual shareholder to reach the assets of the corporation when the requirements of the doctrine are satisfied. *See Rainbo Gold Mines v. Magnus*, 371 F.2d 519, 524–25 (10th Cir.1966); *Shamrock Oil & Gas Co. v. Ethridge*, 159 F.Supp. 693 (D.Colo.1958); *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 917, 591 P.2d 1078, 1084 (1979). *But see Olympic Capital Corp. v. Newman*, 276 F.Supp. 646, 655 (C.D.Cal.1967). That issue has yet to be addressed in Utah, although it follows logically from the basic premise of the alter ego rule and appears consistent with our case law. But even assuming we would so extend the doctrine, Transamerica has not made out a case for the doctrine's application here.

We have said that to invoke the equitable alter ego doctrine,

> there must be a concurrence of two circumstances: (1) there must be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would

sanction a fraud, promote injustice, or an inequitable result would follow.

*Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979); *see also Municipal Bldg. Auth. v. Lowder*, 711 P.2d 273, 278 (Utah 1985); *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 794 (Utah 1984). Applying this test, the trial court found both preconditions to be satisfied; we conclude, however, that it misconceived the second requirement.

We have also said, "[t]he [alter ego] test's second prong is addressed to the conscience of the court, and the circumstances under which it will be met will vary with each case." *Messick*, 678 P.2d at 794. However, that does not mean that a court has carte blanche to refuse to recognize the legal separation of shareholder and corporation. The second prong of the test is not met simply because a trial court finds that that form would in some way prevent a creditor of a controlling shareholder from quickly being made whole. The inequity contemplated by the second requirement of the alter ego test is not present just because the existence of the corporate form is inconvenient for a creditor seeking to pursue the shareholder's assets; it is not enough for the creditor to complain that it must proceed against the shareholder's assets, including the stock in the corporation, rather than simply levying on the corporation's assets. To find that "observance of the corporate form would sanction a fraud [and] promote injustice[ ] or an inequitable result would follow," it must be shown that the corporation itself played a role in the inequitable conduct at issue. *Cf. Dockstader v. Walker*, 29 Utah 2d at 373, 510 P.2d at 528; *Frigidaire Sales Corp. v. Union Properties, Inc.*, 88 Wash.2d 400, 405, 562 P.2d 244, 247 (1977).

Here, the corporation was a stranger to the alleged defrauding of Transamerica by Hafen. Transamerica did not rely on the existence of Dixie in its dealings with Hafen, and the money in Dixie's bank account was entirely unrelated to Hafen's Transamerica activities. Under these circumstances, the second requirement of the alter ego doctrine was not satisfied and Dix-

ie's assets were not subject to direct levy by Hafen's creditors on that ground.

 We next consider Dixie's counsel's contention that the trial court erred by discharging his lien on Dixie's assets. We question the way in which this issue comes to us. Gubler filed his lien a few days after the court ruled that Dixie was Hafen's alter ego. The court initially granted the lien but stayed that order and revoked it in its order granting summary judgment to Transamerica on the alter ego issue. Now Gubler attempts to bring this appeal on behalf of Dixie, challenging the alter ego determination and, at the same time, attempts to appeal the order invalidating his lien against Dixie's funds. The conflict in his position is obvious. In an attempt to forestall just this situation, we held in *Midvale Motors, Inc. v. Saunders*, 21 Utah 2d 181, 442 P.2d 938 (1968), that "the better rule, in the absence of special circumstances requiring a contrary holding to prevent injustice, is to require counsel to bring a separate action against his client to determine the amount of his fee." *Id.* 442 P.2d at 941. Because the trial court nevertheless ruled on the lien claim, we will review the court's order.

Gubler relies on section 78–51–41 of the Code, which provides for attorney's liens in certain circumstances.[1] Counsel's reliance is misplaced. Section 78–51–41 clearly allows attorneys to attach only the proceeds of the work he or she has performed, that is, the proceeds of a judgment obtained in his or her client's favor. Here, the attempt is merely to levy on a client's existing assets. That is not authorized by section 78–51–41.

For the foregoing reasons, we reverse the summary judgment and remand for further proceedings in accordance with this opinion. We affirm the denial of the attorney's lien.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.

---

1. Section 78–51–41 reads:

    The compensation of an attorney and counselor for his [or her] services is governed by agreement, express or implied, which is not restrained by law. From the commencement of an action, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his [or her] client's cause of action or counterclaim, which attaches to a verdict, report, decision or judgment in his [or her] client's favor and to the proceeds thereof in whosesoever hands they may come, and cannot be affected by any settlement between the parties before or after judgment.

    Utah Code Ann. § 78–51–41 (1987) (amended Supp.1989).